**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re | Chapter 11 |
| CLAIM JUMPER ACQUISITION COMPANY, LLC, *et al.*, | Case No. 22-21941-GLT |
| | Jointly Administered |
| Debtors. [1] | Doc. No.: |
| CLAIM JUMPER ACQUISITION COMPANY, LLC, *et al.*, | Related to Doc. No.: |
| | Hearing Date and Time: November 22, 2022, at 1:30 p.m. (EST) |
| Movants, | |
| v. | Objection Deadline: November 22, 2022, at 9:00 a.m. (EST) |
| No Respondents. | |

**DEBTORS' EXPEDITED MOTION FOR ENTRY OF ORDERS: (A) (I) AUTHORIZING
AND APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING AN
AUCTION AND A SALE HEARING, (III) APPROVING THE FORM
AND MANNER OF NOTICE THEREOF, AND (IV) ESTABLISHING NOTICE
AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND LEASES; (B) (I) APPROVING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES AND (II) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; (C) (I) ESTABLISHING PROCEDURES WITH RESPECT TO
FINAL FEE APPLICATIONS; (II) AUTHORIZING THE DEBTORS TO MAKE
DISTRIBUTIONS TO CLAIMANTS HOLDING ALLOWED PROFESSIONAL FEE
CLAIMS, (III) DISMISSING THE DEBTORS' CHAPTER 11 CASES; (D) GRANTING
<u>RELATED RELIEF; AND (E) REQUEST FOR EXPEDITED HEARING</u>**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Claim Jumper Acquisition Company, LLC (0150); Claim Jumper Restaurant (Phoenix), LLC (4316); Claim Jumper Restaurant (Sacramento), LLC (7122); Claim Jumper Restaurant (Tualatin), LLC (4248); C Jumper Restaurant, Inc. (9351); KRG BHTT, LLC (3178); KRG JCS Redondo Beach, LLC (4256); KRG JCS, LLC (5784).  The Debtors' address is 1000 Jacks Run Rd., North Versailles, PA 15137.

The above-captioned debtors and debtors in possession (the "Debtors"), respectfully move (the "Motion") as follows:

**RELIEF REQUESTED**

1.     By this Motion, the Debtors seek entry of the following:

a.     an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

     i.     authorizing and approving the proposed bidding procedures substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures")[2] in connection with one or more sales or dispositions (collectively, the "Sale") of all or substantially all of the Debtors' assets (the "Assets");

     ii.    establishing the below dates and deadlines for the sale process:

| Date | Deadline |
| --- | --- |
| **Within 3 business days following entry of the Bidding Procedures Order** | Deadline to mail Sale Notice and Contract Notice |
| **4:00 p.m. (ET) 14 days following mailing of the Sale and Contract Notice** | Sale Objection Deadline and Contract Objection Deadline[3] |
| **December 9, 2022 at 5:00 p.m. (ET)** | Bid Deadline |
| **December 10, 2022** | Deadline for Debtors to Designate Qualifying Bids and Baseline Bid |
| **December 13, 2022 commencing at 10:00 a.m. (ET)** | Auction |

---

[2]   Capitalized, undefined terms are defined below and in the Bidding Procedures.

[3]   The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Bidder), with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

| | |
|---|---|
| **As soon as practicable after completion of the Auction** | Deadline to File and Serve Notice of Successful Bidder |
| **December 14, 2022 at noon (ET)** | Adequate Assurance Objection Deadline for Successful Bidder other than the Stalking Horse Bidder |
| **December 14, 2022 at noon (ET)** | Debtors' Deadline to Reply to Sale Objections (other than Adequate Assurance Objections) |
| **December 15, 2022 at 10:00 a.m. (ET)** | Sale Hearing (Subject to Court Availability) |
| **On or before December 23, 2022** | Sale Closing |

iii. approving the form and manner of notice of the auction, if any, for the Debtors' Assets (the "Auction"), the Sale and the hearing with respect to the approval of the Sale (the "Sale Hearing"), attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice");

iv. approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale and approving the form and manner of notice thereof, attached as Exhibit 3 to the Bidding Procedures Order (the "Contract Notice"); and

v. granting related relief; and

b. following entry of, and compliance with, the Bidding Procedures Order,

one or more orders (each, a "Sale Order") at the Sale Hearing:

i. authorizing and approving the Sale of the Assets to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable (the "Purchaser"), free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreement or asset purchase agreement(s) with the otherwise Successful Bidder(s), as applicable (the "Asset Purchase Agreement");

ii. authorizing and approving the assumption and assignment of the Assigned Contracts as set forth in the Asset Purchase Agreement;

iii. granting related relief; and

c.     following the closing of a Sale of substantially all of the Debtors' Assets,

orders, substantially in the forms attached hereto as **Exhibit B** and **Exhibit C** (the "Initial

Dismissal Order," and the "Dismissal Order," respectively, and together, the "Proposed

Dismissal Orders,"):

     i.     approving procedures for the filing and approval of claims and final fee applications by professionals retained in these chapter 11 cases (collectively, the "Professionals"), and providing for payment of fees incurred by Professionals in the chapter 11 cases ("Professional Fee Claims");

     ii.     dismissing the Debtors' chapter 11 cases; and

     iii.     granting related relief.

2. Notwithstanding anything to the contrary in this Motion, the Bidding

Procedures Order, or the Bidding Procedures, the Debtors reserve their right, in their business

judgment and in consultation with the Committee, to elect not to proceed with the Bidding

Procedures and Auction and to instead sell their assets pursuant to one or more private sales.

### JURISDICTION AND VENUE

3. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and

the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory and legal predicates for the relief sought herein are sections

105, 349, 363, 365 and 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as

amended, the "Bankruptcy Code"), as supplemented by rules 2002, 6004, 6006, and 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## GENERAL BACKGROUND

5.     On October 3, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  No trustee or examiner has been appointed in these cases.

6.     On October 18, 2022, the Office of the United States Trustee for the Western District of Pennsylvania (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code (D.I. 103).  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     A detailed description of the Debtors, their businesses, and the facts and circumstances supporting this Motion and the Debtors' filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code are set forth in greater detail in the *Declaration of Michael Wyse in Support of First Day Relief* (the "First Day Declaration") (D.I. 18).  This Motion incorporates by reference the facts set forth in the First Day Declaration as if fully set forth herein.

## THE SALE PROCESS

8.     Prior to the Petition Date, the Debtors engaged Michael Wyse and Wyse Advisors LLC ("WALLC").  In his capacity as CRO, Mr. Wyse is an officer of the Debtors with the power and authority to, among other things, assist the Debtors in carrying out their duties under the Bankruptcy Code and formulate, oversee, and direct a process for the evaluation and negotiation of any financing, sale, or restructuring transaction.  Following the Petition Date, WALLC initiated the steps necessary to conduct a postpetition marketing process, including

preparing a teaser, confidential information memorandum, and other marketing and due diligence materials, and compiling a list of potential buyers.

9.      On October 25, 2022, the Debtors and WALLC commenced a robust marketing process to maximize the value of the Debtors' estates for creditors and other stakeholders and facilitate a going concern sale of the Debtor' business.  Through WALLC, the Debtors have distributed the teaser to 330 prospective purchasers, a number of whom have executed confidentiality agreements and are actively reviewing information in the data room and have requested, scheduled, or received management presentations.  WALLC and the Debtors will continue to work with interested parties and any additional parties to provide all necessary diligence and will continue to actively seek potential interested purchasers.

10.      The marketing process and the Bidding Procedures proposed in this Motion provide sufficient time for the Debtors to market the Assets, receive and evaluate bids and proposals and hold an Auction (if necessary) to determine the highest or otherwise best bid. Specifically, the timeline of the Bidding Procedures is aligned with the milestones negotiated for and set forth in that certain *Debtor-in-Possession Loan and Security Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Debtors and Restaurant Lending, LLC ("DIP Lender"), which provides a roadmap through the chapter 11 cases supported by DIP Lender.

11.      To foster competitive bidding, the Debtors believe it is important to establish a floor price for their assets and expression of interest as to which of the Debtors' locations will continue as a going concern, in order to preserve jobs and enable the payment of lease, vendor and other claims related to those locations.  To this end, the Debtors have secured a stalking horse bid from the DIP Lender and or its designee (in the capacity as stalking horse

bidder, the "Stalking Horse Bidder"). The parties anticipate entering into a stalking horse asset purchase agreement (the "Stalking Horse Agreement")[4] providing for, among other things: (i) a credit bid in the amount of the DIP Obligations, currently anticipated to be up to a maximum principal amount of $2.57 million plus interest and fees, and (ii) the assumption of certain liabilities (collectively, the "Stalking Horse Bid"). The Stalking Horse Agreement will require the Debtors to pay an expense reimbursement equal to the actual reasonable and documented out-of-pocket third-party expenses actually incurred by the Stalking Horse Bidder in connection with the negotiation of, and transactions contemplated by, the Stalking Horse Agreement but will not require the Debtors to pay a break-up fee or other forms of bid protections. The Debtors believe that this concession from the Stalking Horse Bidder will further foster interest in the Debtors' assets and aid the Debtors in maximizing value.

## THE PROPOSED SALE AND BIDDING PROCEDURES

### I.   The Bidding Procedures[5]

12.   The Debtors desire to receive the greatest value for the Assets. Although the Debtors believe the proposed Stalking Horse Bid is fair and reasonable, consistent with the Bidding Procedures, the Debtors nevertheless intend to offer the Assets for sale pursuant to a value-maximizing section 363 sale process aimed at achieving higher or otherwise better bids.

13.   Certain of the key terms of the Bidding Procedures, which shall apply to Potential Bidders, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction, are included below:

---

[4]   The Debtors will file a copy of the Stalking Horse Agreement in advance of the hearing on this Motion.

[5]   Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order. To the extent any inconsistencies exist between the summary provided in this Motion and the actual terms and conditions of the Bidding Procedures, the Bidding Procedures control.

(a) **<u>Qualification as Bidder</u>**:  Any person or entity (other than the Stalking Horse Bidder) that wishes to participate in the bidding process for the Assets (each, a "<u>Potential Bidder</u>") must first become a "<u>Qualifying Bidder</u>" in the reasonable discretion of the Debtors after consultation with the Consultation Parties.  In order to become a Qualifying Bidder, and thus being able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "<u>Data Room</u>"), a Potential Bidder must submit to the Debtors and their advisors (unless waived by the Debtors):

   i. documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

   ii. an executed nondisclosure or confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

   iii. a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the DIP Lender, in its capacity as such, and the Committee (collectively, the "<u>Consultation Parties</u>"), that the interested party has a *bona fide* interest in consummating a sale transaction; and

   iv. sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Bidder is a Qualifying Bidder, and the Stalking Horse Agreement is a Qualifying Bid; and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

(b) **<u>Due Diligence</u>**:  The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be directed to: Mike Wyse (mwyse@wyseadvisorsllc.com); with a copy to Robert J. Dehney (rdehney@morrisnichols.com), Matthew B. Harvey (mharvey@morrisnichols.com) and S. Christopher Cundra

(scundra@morrisnichols.com).  The due diligence period shall extend through and including the Bid Deadline.  The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline.  The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.  Notwithstanding any prepetition limitations, including, without limitation, any nondisclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

**(c)**      **Bid Requirements**:

i.       *Qualifying Bid*.  Other than in the case of the Stalking Horse Bid, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

a.       be in writing;

b.       fully disclose the identity of the Qualifying Bidder and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

c.       set forth the purchase price to be paid by such Qualifying Bidder;

d.       not propose payment in any form other than cash (except as otherwise expressly set forth in the Bidding Procedures);

e.       state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f.       specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse Agreement;

g.    be accompanied by an asset purchase agreement (a "Modified Agreement") marked to reflect any variations from the Stalking Horse Agreement;

h.    state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale;

i.    state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Agreement and provide written evidence in support thereof;

j.    contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Modified Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B), including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtors' receipt of such information;

k.    identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transaction contemplated by the Modified Agreement;

l.    specify whether the Qualifying Bidder intends to operate all or a portion of the Debtors' business as a going concern, intends a full-liquidation, or contemplates the ongoing operations of certain restaurants and the closing of others;

m.    a commitment to close the transactions contemplated by the Modified Agreement by no later than December 23, 2022;

n.    except to the extent submitted as part of the Stalking Horse Bid, not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

o.  not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

p.  contain written evidence satisfactory to the Debtors that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Modified Agreement, with appropriate contact information for such financing sources;

q.  contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

r.  provides for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid, in accordance with the terms of the Modified Agreement;

s.  includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified Agreement;

t.  provides a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the purchase price provided for in the Modified Agreement (or such additional amount as may be determined by the Debtors in their reasonable discretion and in consultation with the Consultation Parties); and

u.  provides that the Deposit shall be forfeited to the Debtors in the event of the Qualifying Bidder's breach of, or failure to perform under, the Modified Agreement, without prejudice to any and all other rights and remedies of the Debtors.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid.  The Debtors reserve the right to

work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to:  (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale; (c) have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to its bid, the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders; (d) agreed to bring any such action or proceeding in the Court; and (e) have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

ii.     *Bid Deadline*.

A Qualifying Bidder, other than the Stalking Horse Bidder, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties and the Consultation Parties so as to be received on or before **December 9, 2022 at 5:00 p.m. (ET)** (the "Bid Deadline"); provided that the Debtors may extend the Bid Deadline without further order of the Court, after consultation with the Consultation Parties.  To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of the chapter 11 cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction, unless the Debtors, after consultation with the Consultation Parties, allow otherwise.**

iii.    *Evaluation of Qualifying Bids*.  The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the Consultation Parties.  The Debtors, after consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid.  No later than **December 10, 2022**, the Debtors shall:  (i) notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid; and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"),

-12-

and shall promptly notify the Stalking Horse Bidder and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

**(d)** **Credit Bidding**: The DIP Lender and any Potential Bidder that has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor holds a validly perfected, non-avoidable security interest or lien; and *provided further* that any credit bid by a Secured Creditor shall contain a cash component sufficient to repay in full the secured claims of a senior Secured Creditor, if any (unless such senior Secured Creditor agrees to a different treatment). Without limiting the generality of the foregoing, (i) the DIP Lender has the right, but not the requirement, to credit bid up to the full amount of the DIP Obligations, as applicable, at or before the Auction in accordance with the terms thereof and pursuant to section 363(k) of the Bankruptcy Code, and (ii) any credit bid submitted by the DIP Lender, whether as the Stalking Horse Bidder or otherwise, shall be deemed a Qualifying Bid notwithstanding the bidding requirements set forth in the Bidding Procedures (including, for the avoidance of doubt, the good faith Deposit requirement, which shall not be applicable to any credit bid by the DIP Lender).

**(e)** **Auction**: If the Debtors receive one or more timely Qualifying Bids then the Debtors shall conduct the Auction. For the avoidance of doubt, if there are timely Qualifying Bids submitted in addition to the Stalking Horse Bid, the Stalking Horse Bidder will participate in the Auction. Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the terms of proposals submitted by each bidder; (b) the extent to which such terms are likely to delay closing of the Sale and the cost to the Debtors and their estates of such delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; (f) the impact on employees, trade creditors and landlords; and (g) any other factors the Debtors may reasonably deem relevant. The Auction shall be governed by the following procedures:

i. the Auction shall be held on **December 13, 2022 at 10:00 a.m. (ET)** (i) at the offices of Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, Delaware 19801 or (ii) on such other date and/or at such other location or by virtual means as determined by the Debtors in consultation with the Consultation Parties;

ii.      only the Qualifying Bidders with Qualifying Bids (the "<u>Auction Bidders</u>"), shall be entitled to make any subsequent bids at the Auction;

iii.      each Auction Bidder must attend the Auction, either on its own behalf or through a duly authorized representative with power to bind such Auction Bidder at the Auction;

iv.      only the Debtors, the Auction Bidders, the Consultation Parties, the Debtors' landlords, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any such landlords and creditors provide counsel for the Debtors one (1) day's prior written notice of their intent to attend the Auction, including the name, title, contact information, and affiliation of any individual attending on behalf of such landlord or creditor; provided that landlords and creditors may only attend the auction to observe the proceedings and shall not be entitled to participate; provided further that the Debtors reserve the right, after consultation with the Consultation Parties, to deny any such landlord's or creditor's request to attend the Auction;

v.      the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi.      the Auction Bidders shall confirm on the record that they have not engaged in any collusion with respect to their bid, the Bidding Procedures, the Auction or the Sale;

vii.      the Auction may include separate discussions or negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all Auction Bidders;

viii.      all material terms of the bid that is deemed to be the highest or otherwise best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

ix.      the Debtors and their professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional or modified procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not materially inconsistent with the Bankruptcy Code, the Bankruptcy Rules, or any applicable order of the Court entered in connection with the chapter 11 cases, including, without limitation, the Bidding Procedures Order, (ii) disclosed to the Auction Bidders, and (iii) do not change the cash requirements for Auction Bidders;

x.     each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xi.    the Auction Bidders shall have the right to make additional modifications to the Modified Agreement (other than all cash bid requirements) in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Asset Purchase Agreement or the Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xii.   the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Agreement as may be amended during the Auction and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xiii.  upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, subject to Court approval, the offer or offers for the Assets that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction (the "Successful Bid(s)").   In making this decision, the Debtors may consider, in consultation with the Consultation Parties, among other things, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Asset Purchase Agreement or Stalking Horse Agreement requested by each bidder, and the net benefit to the Debtors' estates.  The

bidder(s) submitting such Successful Bid(s) shall become the "Successful Bidder(s)," and shall have such rights and responsibilities of the purchaser as set forth in the applicable Modified Agreement(s). The Debtors may, in their sole discretion, designate one or more Back-Up Bids (and the corresponding Back-Up Bidder(s)) to purchase the Assets in the event that the Successful Bidder(s) do not close the Sale(s); and

xiv.   prior to the Sale Hearing, the Successful Bidder(s) and any Back-Up Bidder(s) shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID(S) AND ANY BACK-UP BID(S) SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER(S) AND THE BACK-UP BIDDER(S), RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT A SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

**(f)** **Sale Hearing**: The Successful Bid(s) and any Back-Up Bid(s) (or if no Qualifying Bid other than the Stalking Horse Bid is received, then the Stalking Horse Bid, as the Successful Bid) will be subject to approval by the Court. The Sale Hearing to approve the Successful Bid(s) and any Back-Up Bid(s) shall take place on **December 15, 2022 at 10:00 a.m. (ET)** subject to Court availability. After consultation with the DIP Lender, the Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the chapter 11 cases.

**(g)** **Back-Up Bidder**: Notwithstanding any of the foregoing, in the event that Successful Bidder fails to close the Sale prior to December 23, 2022 (or such date as may be extended by the Debtors, in consultation with the Consultation Parties), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors shall be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

**(h)** **Return of Deposits**: All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder, other than the Stalking Horse Bidder, no later than five (5) business days following the closing of the Sale. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the

-16-

Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Modified Agreement or the Stalking Horse Agreement, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.  For the avoidance of doubt, the Debtors' retention of a Deposit shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Successful Bidder's or Back-Up Bidder's breach or failure to close and all such rights and remedies are preserved.

(i)    **Reservation of Rights**.  Notwithstanding any of the foregoing, the Debtors and their estates reserve the right, after consultation with the Consultation Parties, to modify the Bidding Procedures (other than with respect to the all cash bid requirements) at, prior to, or during the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

14.    The Debtors, in consultation with their advisors, believe that the timeline set forth in the Bidding Procedures will provide parties with sufficient time to obtain information necessary to formulate a competitive bid, maximizing the prospect that the Debtors will receive offers that will benefit the Debtors' estates and their stakeholders.  The Debtors submit that the sale process is reasonable in time and scope, and will permit sufficient time for any interested bidders to conduct their due diligence with respect to the Assets and formulate bids on the Assets.  Accordingly, the Debtors believe the relief requested in this Motion is in the best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate, and thus should be approved.

## II.    Form and Manner of Sale Notice

15.    Within three (3) business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice on the following parties or their respective counsel, if known (collectively, the "Sale Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the

-17-

Committee; (iii) counsel to the DIP Lender; (iv) all parties known by the Debtors to assert a lien on any of the Assets; (v) all persons known or reasonably believed to have asserted an interest in any of the Assets; (vi) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (vii) the Office of the United States Attorney for the Western District of Pennsylvania; (viii) the Office of the Attorney General in each state in which the Debtors operate; (ix) the Office of the Secretary of State in each state in which the Debtors have operated; (x) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (xi) all non-Debtor parties to any of the Assumed Contracts; (xii) all parties that have filed a notice of appearance and requested notice and service in these proceedings pursuant to Bankruptcy Rule 2002; and (xiii) all the Debtors' other known creditors and equity security holders.

16.     Additionally, as soon as practicable after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be published once in the national edition of *USA Today* or another newspaper with national circulation.  The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.  Taken together, these notices will provide notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

### III.     The Sale Hearing and Sale Objection Deadline

17.     The Debtors intend to present the Stalking Horse Bid or otherwise Successful Bid(s) for approval by the Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing.  The Debtors respectfully request that the Sale Hearing be scheduled on or about December 15, 2022.  Upon the failure to consummate a sale of the Assets

after the Sale Hearing because of the occurrence of a breach or default under the terms of the Successful Bid(s) or the non-approval of this Court, the next highest or otherwise best Back-Up Bid(s), if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid(s) without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Back-Up Bid(s).

18.   The Debtors further request that any and all objections to a Sale of the Assets and entry of a Sale Order: (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and all orders of the Court entered in these chapter 11 cases, (iii) be filed with the Court no later than (a) 4:00 p.m. (ET) fourteen (14) days following mailing of the Sale Notice (the "Sale Objection Deadline"), or (b) with respect to objections solely related to the adequate assurance of future performance by the Successful Bidder(s) (other than the Stalking Horse Bidder), December 15, 2022 at noon (ET) (the "Adequate Assurance Objection Deadline"), and (iv) be served on the following parties (collectively, the "Objection Notice Parties"): (a) proposed counsel to the Debtors: (i) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Robert J. Dehney (rdehney@morrisnichols.com), Matthew B. Harvey (mharvey@morrisnichols.com) and S. Christopher Cundra (scundra@morrisnichols.com), and (ii) Whiteford, Taylor & Preston, L.L.P., 11 Stanwix Street, Suite 1400, Pittsburgh, Pennsylvania 15222, Attn: Daniel R. Schimizzi (dschimizzi@wtplaw.com); (b) counsel to the DIP Lender: Goldberg Kohn, 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603-5792, Attn: Randall L. Klein (randall.klein@goldbergkohn.com); (c) proposed counsel to the Committee: (i) Kelley Drye & Warren LLP, 3 World Trade Center, 175 Greenwich Street, New York, NY 10007, Attn: Eric R. Wilson (ewilson@kelleydrye.com), Jason R. Adams

(jadams@kelleydrye.com) and Ravi Vohra (rvohra@kelleydrye.com) and (ii) Frost Brown

Todd LLC, 501 Grant Street, Suite 800, Pittsburgh, PA 15219, Attn: Jordan S. Blask

(jblask@fbtlaw.com), Jillian Nolan Snider (jsnider@fbtlaw.com) and Sloane B. O'Donnell

(sodonnell@fbtlaw.com); (d) the U.S. Trustee, 1001 Liberty Ave., Suite 970, Pittsburgh, PA

15222, Attn: Kate M. Bradley (kate.m.bradley@usdoj.gov); and (e) any Successful Bidders.

### ASSUMPTION AND ASSIGNMENT PROCEDURES

19.     To facilitate the Sale, the Debtors seek authority to assume and assign to

the Successful Bidder, the Assumed Contracts in accordance with the Assumption and

Assignment Procedures.

20.     The Assumption and Assignment Procedures are as follows:

(a)     Within three (3) business days following entry of the Bidding Procedures Order (the "Contract Notice Deadline"), the Debtors shall file with the Court and serve on each counterparty to an Assumed Contract (each, a "Counterparty," and collectively, the "Counterparties") the Contract Notice.

(b)     The Contract Notice shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Contracts.  If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Assumed Contract, (ii) the Cure Amount for its Assumed Contract or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties a written objection (a "Contract Objection").

(c)     Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules and all orders of the Court entered in these chapter 11 cases; (iii) state the basis for such objection; (iv) if such objection is to the Cure Amount, state with specificity what Cure Amount the Counterparty believes is required (in all cases, with appropriate documentation in support thereof); and (v) be filed with the Court and served on the Objection Notice Parties by no later than 4:00 p.m. (ET) fourteen (14) days following mailing of the Contract Notice (the "Contract Objection Deadline").

*Any objections to adequate assurance of performance by the Stalking Horse Bidder shall be filed by the Contract Objection Deadline.*

*Any objections to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder shall be filed in accordance with subparagraph (e) below.*

(d)     As soon as reasonably practicable after the completion of the Auction, or to the extent an Auction is not necessary, then after the Debtors' determination of the Qualifying Bids (in consultation with the DIP Lender), the Debtors shall file with the Court a notice identifying the Successful Bidder (a "Notice of Successful Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Assumed Contracts, and (iii) the proposed assignee(s) of such Selected Assumed Contracts.  For the avoidance of doubt, if the Debtors do not timely receive any Qualifying Bids other than the Stalking Horse Bid, the Stalking Horse Bidder shall be deemed the Successful Bidder.

(e)     As soon as reasonably practicable after the completion of the Auction or, to the extent an Auction was not necessary, after the Debtors' determination of the Qualifying Bids (in consultation with the DIP Lender), the Debtors will cause to be served by overnight mail or email upon each affected Counterparty and its counsel (if known) the Notice of Successful Bidder.

*In the event the Stalking Horse Bidder is not the Successful Bidder, the Counterparties shall file any Contract Objections **solely** on the basis of adequate assurance of future performance not later than **December 15, 2022 at noon (ET)**.*

(f)     At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder, of only those Assumed Contracts that have been selected by the Successful Bidder, to be assumed and assigned (the "Selected Assumed Contracts").  The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

(g)     If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assumed Contract

-21-

against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(h)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(i)     Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties a Contract Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter.  If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assumed Contracts to the Successful Bidder without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

**POST-CLOSING DISMISSAL OF THE CHAPTER 11 CASES**

21.     The Debtors have considered various options to bring these chapter 11 cases to a conclusion following the closing of the Sale and believe, after making appropriate considerations, that a dismissal of these chapter 11 cases is the most expeditious and cost-effective mechanism to wind down the Debtors' affairs.  The Debtors believe that it is unlikely that they will be able to pursue a confirmable chapter 11 plan because they will not have sufficient assets available to pay all administrative and priority creditors in full, nor a credible path to securing a non-insider, impaired consenting class.  The Debtors considered exiting the chapter 11 cases through a chapter 7 process but believe that the additional chapter 7 trustee's

fees, commissions and related costs would make any recovery to priority and unsecured creditors similarly unlikely, if not impossible.  In seeking approval of the post-closing dismissal of these chapter 11 cases pursuant to the Proposed Dismissal Orders, the Debtors (a) propose making payments to holders of allowed Professional Fee Claims, (b) request the dismissal of the chapter 11 cases and related relief on the terms set forth in the Proposed Dismissal Orders attached hereto, and (c) request certain related relief as set forth herein.

## **BASIS FOR RELIEF**

**I.      Sufficient business justification exists for consummation of the Sale under sections 105(a) and 363(b) of the Bankruptcy Code.**

22.      Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  *See*, *e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.)*; *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

23. The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

24. The Debtors submit that their decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors will conduct an extensive and fulsome process to market the Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or otherwise best value available for the Assets, and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Bidder or other Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

25. Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections. The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse Agreement, the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in

interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

26.    The Sale conducted in accordance with the Bidding Procedures will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries to the estates, the Debtors' creditors, and all parties in interest.  The Debtors submit that ample business justification exists for the consummation of the Sale and, therefore, requests that this Court approve such Sale.

27.    In the alternative, in the event that the Debtors, in their business judgment and in consultation with the Committee, seek to pursue one or more private sales in lieu of a sale in accordance with the Bidding Procedures and Auction, such a sale or sales may also be approved to the extent appropriate or value maximizing under the circumstances.

28.    Bankruptcy Rule 6004(f) expressly permits a debtor to conduct a private sale pursuant to section 363.  Specifically, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1); *see Berg v. Scanlon* (*In re Alisa P'ship*), 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . .").

29.    A debtor may conduct a private sale if a good business reason exists.  *See, e.g., In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re MF Global, Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("The business judgment of a trustee is entitled to great deference"); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing private sale of debtors' tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"); *In re Embrace Sys. Corp.*, 178 B.R.

112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved.  The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

30.      The Debtors submit that it is appropriate to authorize them to sell their Assets pursuant to a private sale if a public sale proves unnecessary and, in their business judgment and in consultation with the Committee, such a sale or sales would maximize value for the estates. *See, e.g.*, *In re 160 Royal Palm, LLC*, 2019 U.S. Dist. LEXIS 61611 *12–18 (S.D. Fl. Apr. 10, 2019) (affirming bankruptcy court's decision to allow withdrawal of bidding procedures for public sale and approving private sale).

## II.      The Sale of the Assets free and clear of all encumbrances is authorized under Section 363(f) of the Bankruptcy Code.

31.      Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

32.      Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the

Assets "free and clear" of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

33. The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Encumbrances (except as otherwise expressly set forth in the Sale Order and the Stalking Horse Agreement or an Asset Purchase Agreement with a Successful Bidder, as applicable) in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.

34. With respect to any party asserting a lien, claim, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code. In particular, known lienholders, if any, will receive notice and will be given sufficient opportunity to object to the relief requested. Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's

failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same). Consistent with the foregoing, the Bidding Procedures Order and the Sale Notice provide that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

35.    A sale of the Assets other than one free and clear of all interests would yield substantially less value for the Debtors' estates. The Debtors submit that bidders are unlikely to consummate the Sale absent the ability to purchase the Assets free and clear of all interests. Accordingly, the Debtors request that the Assets be sold free and clear with such interests attaching to the proceeds of the Sale, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.

### III.    The Sale should be subject to the protections of Section 363(m) of the Bankruptcy Code.

36.    Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). In approving the Sale free and clear of all interests and encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length,

good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.

37.       Courts in this Circuit have upheld section 363 purchase agreements "negotiated, proposed, and entered into . . . in good faith, without collusion . . . [resulting from] arm's-length bargaining with . . . parties represented by independent counsel." *In re THQ Inc.*, No. 12-13398 (MFW), 2013 Bankr. LEXIS 781 (Bankr. D. Del. Jan. 24, 2013); *In re Rockdale Marcellus, LLC*, Case No. 21-22080 (Bankr. W.D. Pa. Dec. 29, 2021); *In re Gottschalks Inc.*, Case Nos. 09-10157 (KJC), 526, 603, 2009 Bankr. LEXIS 4880 (Bankr. D. Del. June 10, 2009); *In re Against All Odds USA, Inc.*, Case Nos. 09-10117 (DHS), TIN: 22-3391747, 2009 Bankr. LEXIS 5234, at *1 (Bankr. D.N.J. May 28, 2009); *In re Allegheny Health, Educ. & Research Found.*, Case Nos. 98-25773, 98-25774, 98-25775, 98-25776, 98-25777, 1998 Bankr. LEXIS 1684, at *31 (Bankr. W.D. Pa. Oct. 30, 1998).

## IV.    The Court should approve the Bidding Procedures.

38.       The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).   Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

39.       The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and

-29-

creditors.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.  Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received in order to determine which bids are in the best interests of the Debtors' estates and their creditors.

40.    The Debtors submit that the Bidding Procedures are fair and transparent and will derive the highest or best bids for the Assets.  Therefore, the Debtors request the Court approve the Bidding Procedures.

## V.    The assumption and assignment of the Assumed Contracts in connection with the Sale satisfies section 365 of the Bankruptcy Code.

41.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

42.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar

decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872). Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

43.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

44.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assumed Contracts is in the best interests of

the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See*, *e.g.*, *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

45.     As set forth above, the Sale will provide significant benefits to the Debtors' estates.  To that end, the assumption, assignment and sale of the Assumed Contracts is necessary for the Debtors to obtain the benefits of any Asset Purchase Agreement or Stalking Horse Agreement, as applicable.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Thus, following an assignment to the Successful Bidder of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

46.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to an Assumed Contract, a Contract Notice that indicates the proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful

Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

47.      Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

48.      Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

49.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  In order for its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "Adequate Assurance Information"), including:  (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent available, the Adequate Assurance Information may also include: (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee; and (y) financial statements, tax returns, annual reports or summaries thereof.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

50.     Therefore, the Debtors respectfully request the Court (a) approve the proposed assumption and assignment of the Assumed Contracts, and (b) find that all anti-assignment provisions of such contracts are unenforceable under section 365(f) of the Bankruptcy Code.[6]

---

[6]     Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision

**VI.     The DIP Lender should be authorized to Credit Bid for the Assets under section 363(k) of the Bankruptcy Code.**

51.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459–60 (3d Cir. 2006).

52.     As a result, the Debtor proposes that creditors whose claims are secured by valid, first-priority, binding, enforceable, non-avoidable and perfected liens on and security interests in the Assets be entitled to credit bid all or a portion of the principal amount of the secured debt owed to such creditors under section 363(k) of the Bankruptcy Code and as provided for in the Bidding Procedures.

**VII.    These chapter 11 cases must be dismissed if the elements for "cause" are shown under section 1112(b)(4) of the Bankruptcy Code.**

53.     Upon the request of a party in interest, § 1112(b)(1) of the Bankruptcy Code provides that, absent unusual circumstances, a court "shall" dismiss a chapter 11 bankruptcy case (or convert such case to a case under chapter 7) "for cause."  *See* 11 U.S.C. § 1112(b)(1).   The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory language with respect to conversion or dismissal from permissive to mandatory.  *See* H.R.   Rep.   No.   109-31(I), at 442, *reprinted in* 2005

---

because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances."); *see also Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to section 1112 limit the court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal, such that this Court has no choice, and no discretion, in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4)."). For reasons more fully explained below, the Debtors submit that the Court should dismiss the chapter 11 cases following the closing of the Sale because cause exists. Further, dismissal (and not conversion to a case under chapter 7) is in the best interests of the Debtors, their creditors, and their estates.

**VIII.**     **Cause exists to dismiss the chapter 11 cases because post-closing, the Debtors will have ceased business operations and will have insufficient assets to confirm a plan.**

54.     Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of 16 grounds for dismissal. 11 U.S.C. § 1112(b)(4)(A)-(P). *See In re Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3d Cir. 1991)); *In re 3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, [and] not exhaustive has not.") (citation omitted)

55.     One statutory basis to dismiss a case is where a party in interest shows that there has been a "loss" or "diminution" of value of the estate and (b) the debtor does not have a "reasonable likelihood of rehabilitation." *See* 11 U.S.C. § 111(b)(4)(A); *see also In re Photo Promotion Assocs., Inc.*, 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985); *Clarkson v. Cooke Sales & Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (dismissal is warranted where "the absence of financial data and certain sources of income for the [debtors] indicate[d] the absence of a reasonable likelihood of rehabilitation"). Further, the dismissal of a chapter 11 case has been found appropriate where "a feasible plan is not possible." *In re 3 Ram*, 343 B.R. at 117-18. "If [a] chapter 11 [debtor] cannot achieve . . . reorganization within the statutory requirements of the Bankruptcy Code, then there is no point in expending estate assets on administrative expenses . . . ." *Id.* at 118 (citing, *inter alia*, *In re Brown*, 951 F.2d at 572).

56.     The Debtors do not believe that a chapter 11 plan will be feasible in these cases. Through the Sale, the Debtors intend to liquidate substantially all of their assets. Post-closing, the Debtors' estates will exist solely to (i) meet the Debtors' obligations under the approved asset purchase agreement approved in connection with the Sale, and (ii) effectuate an orderly exit from these chapter 11 cases. While doing so, the estates will continue to accrue Professional Fees and U.S. Trustee fees, which have been addressed pursuant to the DIP Order. Post-closing, there will no longer be a business to reorganize or assets to distribute, and thus no reason (or funds available) to pursue a plan of reorganization or liquidation. Accordingly, cause exists to dismiss the chapter 11 cases post-closing pursuant to section 1112(b)(4) of the Bankruptcy Code and relevant case law.

## IX.     Dismissal is in the best interests of the Debtors' creditors and their estates.

57.     Once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court must then evaluate whether dismissal is in the best interests of the debtor's

-37-

creditors and of the estate. *See, e.g.*, *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert."). A variety of factors demonstrate that it is in the best interest of the Debtors' estates and their creditors to dismiss the chapter 11 cases.

58.    *First*, a dismissal of a chapter 11 bankruptcy case meets the "best interests of creditors" test where a debtor has nothing to reorganize and the debtor's assets are fixed and liquidated. *See Camden Ordinance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business which ceased business was unfeasible); *Royal Trust Bank, N.A. v. Brogdon Inv. Co. (In re Brogdon Inv. Co.)*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the reorganization). Post-closing, the Debtors will have nothing left to reorganize because substantially all of their assets and operations will be transferred to the Purchaser upon the closing of the Sale, and the Debtors will have insufficient cash to make distributions to creditors pursuant to a chapter 11 plan or upon conversion of the chapter 11 cases to chapter 7.

59.    *Second*, a court may find dismissal to be in the "best interests of the creditors" where a debtor demonstrates the ability to oversee its own liquidation. *See Camden Ordinance*, 245 B.R. at 798; *Mazzocone*, 183 B.R. at 412 ("Only when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation . . . should a debtor be permitted to remain in bankruptcy . . . ."). Post-closing, the Debtors will have already liquidated their assets and anticipated being positioned to satisfy all allowed Professional Fee Claims, in full, prior to

dismissing the chapter 11 cases. Accordingly, the Debtors have demonstrated their ability to oversee their own liquidation, to the extent this factor applies.

60. *Third*, and finally, dismissal is appropriate where, as here, it will maximize the value of the Debtors' estates because the alternative—conversion to a chapter 7 liquidation and appointment of a trustee—is (a) unnecessary and would provide no benefit to creditors and (b) would impose significant additional administrative costs upon the Debtors' estates without any meaningful source of funds to satisfy such costs.

61. Under the circumstances, a chapter 7 trustee would have extremely limited funds to satisfy additional claims arising after conversion to cases under chapter 7 of the Bankruptcy Code. Given the amount of asserted priority claims, it is unlikely that Sale proceeds will be sufficient to result in a full recovery for the Debtors' prepetition priority claims or any recovery for unsecured creditors. As a result, such creditors would not receive greater recoveries (and certain creditors and stakeholders could possibly fare worse) in a chapter 7 liquidation. For these reasons, the Debtors submit that a dismissal pursuant to section 1112 of the Bankruptcy Code is in the best interests of the Debtors' creditors and their estates.

**X. The Court should establish a procedure to approve Professional Fees.**

62. In connection with winding down the Debtors' estates and the dismissal of the chapter 11 cases, the Debtors seek the Court's approval of procedures for the final payment of Professional Fees and expenses incurred by Professionals on behalf of the Debtors' estates throughout the chapter 11 cases.

63. Specifically, the Debtors request that the Court allow the Debtors to set a deadline for all Professionals to file final requests for allowance and payment of all fees and expenses incurred during the chapter 11 cases (collectively, the "Final Fee Applications") at twenty-one (21) days (the "Final Fee Application Deadline") after the Debtors serve a notice of

-39-

the final omnibus fee hearing on Professional Fees (the "Final Fee Hearing").  The notice of the

Final Fee Hearing will also contain the date and time of the Final Fee Hearing received from the

Court.  The Debtors further request that any objections to the Final Fee Applications be filed and

served on counsel for the Debtors and such applicable Professional by 4:00 p.m.  (prevailing

Eastern Time) no later than fourteen (14) days after the Final Fee Application Deadline.

64.    Courts in this Circuit have granted similar relief in the context of

dismissals.  *See, e.g.*, *In re RM Wind-Down Holdco LLC*, Case No. 18-11795-MFW (Bankr. D.

Del. Apr. 30, 2019) (D.I. 635); *In re The Wet Seal, LLC*, Case No. 17-10229-CSS (Bankr. D.

Del. Mar. 19, 2019) (D.I. 1006); *In re The Bon-Ton Stores, Inc.*, Case No. 18-10248-MFW

(Bankr. D. Del. Feb. 1, 2019) (D.I. 1436); *In re Quantum Foods, LLC*, Case No. 14-10318-KJC

(Bankr. D. Del. Apr. 6, 2018) (D.I. 1798); *In re Sunco Liquidation, Inc.*, No. 17-10561-KG

(Bankr. D. Del. Aug. 18, 2017) (D.I. 706).

**XI.    Post-dismissal, all prior releases, stipulations, settlements, rulings, orders and judgments should remain binding and should continue to have full force and effect.**

65.    The dismissal of a chapter 11 case ordinarily vacates certain orders

previously entered by the bankruptcy court and restores parties to the prepetition status quo.  *See*

11 U.S.C. § 349(b).  A bankruptcy court may, however, "for cause, order[] otherwise . . . ." *Id.*

Courts in this Circuit have regularly maintained the enforceability of orders approving sales,

releases and settlements, after a dismissal, notwithstanding section 349 of the Bankruptcy Code.

*See, e.g.*, *In re RM Wind-Down Holdco LLC*, Case No. 18-11795-MFW (Bankr. D. Del. Apr. 30,

2019) (D.I. 635); *In re Sunco Liquidation, Inc.*, Case No. 17-10561-KG (Bankr. D. Del. Nov. 6,

2017) (D.I. 865); *In re Old Towing Co.*, Case No. 17-10249-LSS (Bankr. D. Del. May 30, 2017)

(D.I. 381); *In re TAH Windown, Inc.*, Case No. 16-11599-MFW (Bankr. D. Del. Jan. 13, 2017)

(D.I. 408).

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

66.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).  As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and estates.

67.    For the reasons set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

## REQUEST FOR EXPEDITED HEARING

68.    The Debtors seek the relief requested in this Motion on an expedited basis and respectfully request that the Court schedule a hearing on this Motion on an expedited basis.

69.    As is set forth above, the Debtors have considered various options to bring these chapter 11 cases to a conclusion and have determined, in their sound business judgment, that the Sale proposed herein followed by a dismissal of these chapter 11 cases in accordance with the procedures set forth in this Motion, is the most expeditious and cost-effective mechanism to wind down the Debtors' affairs.

70.    The Debtors believe they will suffer irreparable harm in the event the Court does not consider the relief requested in this Motion on an expedited basis, as based on

their cash flow and operational revenue, the Debtors will be unable to continue operating as a going concern past the deadlines proposed in connection with the Sale.

71.     Conversely, no creditors or parties in interest will be prejudiced by considering the relief requested in this Motion on an expedited basis, as the Debtors, with the assistance of their advisors, have determined that the processes and procedures set forth herein reflect a value-maximizing strategy to expeditiously and efficiently bring these chapter 11 cases to a close.

72.     The need for an expedited hearing on the relief requested in this Motion has not resulted from any delay on behalf of the Debtors or their advisors, but has been brought about solely for reasons beyond their control.

## NOTICE

73.     Notice of this Motion is being provided to: (a) the Office of the United States Trustee for the Western District of Pennsylvania; (b) counsel for the Committee; (c) counsel for the DIP Lender; (d) all parties known by the Debtors to assert a lien on any of the Assets; (e) the Office of the Attorney General in each state in which the Debtors have operated; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of the Sale, through the Sale Notice, will be provided and published as set forth above in this Motion. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[*The remainder of this page is intentionally left blank.*]

## CONCLUSION

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and

the Sale Order, granting the relief requested herein and such other and further relief as is just and

proper.

Dated: November 17, 2022
      Pittsburgh, Pennsylvania

WHITEFORD, TAYLOR & PRESTON, L.L.P.

*/s/ Daniel R. Schimizzi*
Daniel R. Schimizzi, Esq. (PA I.D.: 311869)
11 Stanwix Street, Suite 1400
Pittsburgh, Pennsylvania 15222
Tel: (412) 275-2401
Fax: (412) 275-2404
dschimizzi@wtplaw.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney, Esq.
Matthew B. Harvey, Esq. (admitted *pro hac vice*)
Tamara K. Mann, Esq. (admitted *pro hac vice*)
Taylor M. Haga, Esq. (admitted *pro hac vice*)
S. Christopher Cundra IV, Esq. (admitted *pro hac vice*)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
rdehney@morrisnichols.com
mharvey@morrisnichols.com
tmann@morrisnichols.com
thaga@morrisnichols.com
scundra@morrisnichols.com

*Proposed Counsel to the Debtors and
Debtors in Possession*